Calvin BAKER, Petitioner,

v.

Floyd BENNETT, Superintendent, Respondent.

No. 01 Civ. 1368(RMB)(DF).

United States District Court, S.D. New York.

Dec. 6, 2002.

Calvin Baker, Elmira, NY, pro se.

John E. Knudsen, Assist. Atty. Gen., New York City, for U.S.

## *ORDER*

BERMAN, District Judge.

### I. Introduction

On or about February 23, 2001, Calvin Baker ("Baker" or "Petitioner") filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"), challenging his December 13, 1996 conviction in Supreme Court, New York County, for robbery, burglary, and sodomy in the first degree. N.Y. Penal Law §§ 160.15[3], 140.3[3], 130.50[1]. Baker's conviction was affirmed on September 30, 1999 by the Appellate Division, First Judicial Department, *People v. Baker*, 264 A.D.2d 692, 696 N.Y.S.2d 125 (App. Div. 1st Dep't 1999). Leave to appeal was denied by the New York Court of Appeals on February 2, 2000. *People v. Baker*, 94 N.Y.2d 901, 707 N.Y.S.2d 385, 728 N.E.2d 984 (2000).

In his Petition, Baker alleges, among other things, that: (1) the trial court violated his Fourth Amendment rights by failing to suppress unlawfully obtained evidence; and (2) the trial court improperly excluded two (potential) jurors over Petitioner's *Batson* objection. Respondent opposed the Petition on July 26, 2001; and Petitioner filed a reply dated August 14, 2001.

On January 18, 2002, Magistrate Judge Debra Freeman, to whom this matter had been referred, issued a detailed, thorough Report and Recommendation ("Report"), recommending that the Petition be dismissed, Report at 2, and that the Court should decline to issue a certificate of appealability "because Petitioner has not 'made a substantial showing of the denial of a constitutional right.'" *Id.* at 21 (quoting 28 U.S.C. § 2253(c)(2)).

The Report advised the parties that "[p]ursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections." *Id.* Petitioner filed objections to the Report on February 2, 2002 ("Petitioner's Objections"). **For the reasons stated below, the Report is adopted in all respects and the Petition is dismissed.**

## II. Standard of Review

This Court may adopt those portions of a report to which no objections have been made and which are not facially erroneous. *See* Fed.R.Civ.P. 72(b); *see, e.g., Letizia v. Walker,* No. 97 Civ. 0333, 1998 WL 567840, at *1 (W.D.N.Y. Aug. 27, 1998); *Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y. 1991); *Nelson v. Smith,* 618 F.Supp. 1186,

1189 (S.D.N.Y.1985). The court conducts a de novo review of those portions of a Magistrate's report to which objections have been made. *See, e.g., Letizia,* 1998 WL 567840 at *1; *Pizarro,* 776 F.Supp. at 817. Once objections are received, a district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate. *See, e.g., DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988). Where, as here, the petitioner is proceeding *pro se,* "leniency is generally accorded." *Bey v. Human Resources Admin.,* No. 97 Civ. 6616, 1999 WL 31122, at *2 (E.D.N.Y. Jan.12, 1999).

## III. Analysis

The Court has conducted a *de novo* review of the record herein, including, among other things, the Report, Petitioner's Objections, and applicable legal authorities, and concludes that Magistrate Freeman's legal and factual determinations are supported by the record and the law in all material respects. Petitioner's Objections do not provide a basis for departing from the Report's recommendations.[1]

### A. *Fourth Amendment Claim*

Magistrate Freeman correctly concluded that "Petitioner was afforded a full and fair opportunity to litigate his claim in state court." Report at 12. Where, as here, "the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

---

1. As to any portions of the Report to which no objections have been made, the Court concludes that the Report is not clearly erroneous. *See Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). Any objections which are not specifically discussed in this Order have been considered and rejected.

was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *see also Torres v. Irvin,* 33 F.Supp.2d 257, 264 (S.D.N.Y. 1998). Petitioner was afforded a pretrial *Mapp* hearing; there was a detailed ruling by the trial court; and Petitioner availed himself of the opportunity to attack the legality of the state court process by raising his Fourth Amendment claim(s) in the Appellate Division. Report at 11; *see* May 23, 1996 Hearing Transcript; Trial Court Decision, dated August 23, 1996; *Baker,* 696 N.Y.S.2d 125.

### B. *Batson Claim*

■ Magistrate Freeman properly determined that under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254(d) (2000), there is "no basis for this Court to set aside the Appellate Division's rejection of Petitioner's *Batson* claim ...." Report at 21.[2] The Magistrate found, among other things, that "the Appellate Division identified the correct legal principle governing the propriety of the trial court's conduct," and that the Appellate Division appropriately applied "the relevant legal principle in upholding the trial court's determination." *Id.* at 17; *see* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Magistrate also reviewed the record and properly determined that the trial court's factual findings (as to whether the prosecution's stated reasons for its peremptory challenges were

pretextual) were "fairly supported and cannot be deemed inherently 'unreasonable,' under AEDPA § 2254(d)(2)," and that such findings are "entitled to great deference." Report at 19; *see United States v. Alvarado,* 951 F.2d 22, 25 (2d Cir.1991).

### IV. Conclusion

The Court adopts the Report in all respects and, for the reasons stated therein and herein, denies Baker's Petition. A certificate of appealability is also denied because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Clerk is respectfully requested to close this case.

## REPORT AND RECOMMENDATION

FREEMAN, United States Magistrate Judge.

### *INTRODUCTION*

*Pro se* petitioner Calvin Baker ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction in New York State Supreme Court, New York County. Upon a jury verdict, Petitioner was found guilty of two counts each of robbery, burglary, and sodomy in the first degree, and was sentenced to an indeterminate term of twenty-two to forty-four years. (Pet. at 2.)[1] Petitioner is currently incarcerated at Elmira Correctional Facility.

---

2. The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim(1) resulted in a decision that was contrary to, or involved an unreasonable applica-

tion of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1. "Pet." refers to Petitioner's petition under 28 U.S.C. § 2254, dated December 26, 2000.

Petitioner challenges his conviction, asserting that the trial court violated Petitioner's Fourth Amendment rights by failing to suppress unlawfully obtained evidence and preclude certain line-up and in-court identification testimony, and that the court improperly excluded two potential jurors over Petitioner's *Batson* objection. (*See* Pet. at 5.)[2]

Respondents argue that the petition should be dismissed because Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim, thus precluding federal habeas review, and because the state court's rejection of Petitioner's *Batson* claim was not "contrary to" or an "unreasonable application" of clearly established Federal law, nor was it an "unreasonable determination of the facts in light of the evidence before the court." (*See* Resp. Mem. at 1–2, 19–30.)[3] For the reasons set forth below, I recommend that the petition be DISMISSED.

## FACTUAL BACKGROUND

According to the trial transcript, on September 16, 1995, at approximately 5:30 a.m. (Tr. at 47),[4] Kenneth Atkinson awoke to find a man, later identified as Petitioner, in the bedroom of his apartment on East 81st Street, near Lexington Avenue. (*Id.* at 34, 39.) Petitioner was pressing himself to Mr. Atkinson's stomach with a knife to his throat (*id.* at 39–40, 103–106), warning him to keep still. (*Id.* at 39–40.) Mr. Atkinson and his wife, Anne Atkinson, further testified that Petitioner then directed Ms. Atkinson to bring him money and jewelry. (*Id.* at 40–44, 106–15.) Petitioner took money and gold chains from Ms.

Atkinson, and then walked out of the bedroom holding a knife to her throat, ultimately exiting the apartment alone, through the apartment door. (*Id.* at 45, 115–16.)

As stated at trial, approximately three weeks later, on October 7, 1995, Petitioner entered the bedroom of Sue Evans ("Evans") and her husband, on East 91st Street, near Madison Avenue (Tr. at 174), and took money he found hidden there (*id.* at 185). Evans, nine months pregnant and asleep on the couch at the time of the burglary (*id.* at 178), testified that Petitioner proceeded to the living room and awakened her by pressing a knife to her neck, covered her mouth, and threatened to kill her if she screamed (*id.* at 181, 184). Petitioner eventually removed his hand from her mouth and demanded money. (*Id.* at 184–85.) When she realized that he had already taken money from the bedroom, Evans offered him a diamond ring that she kept in the bedroom. (*Id.* at 185–86.) Evans testified that Petitioner then stuffed a blanket into her mouth, pressed his knife to her stomach, and performed oral sex upon her. (*Id.* at 186.) Petitioner then forced Evans with him to the bedroom, where her husband still slept, to retrieve the diamond ring. (*Id.* at 187.) According to Evans, Petitioner then brought her back to the living room and again performed oral sex upon her, finally telling her, "I wouldn't have killed you. I would have killed your baby." (*Id.* at 187–90.) Evans further testified that Petitioner again threatened to kill her if she called the police, then left the apartment. (*Id.* at 191.)

---

2. "Pet. Att." refers to the materials attached to the petition.

3. "Resp. Mem." refers to Respondents' Memorandum of Law in Opposition to Petition For a Writ of Habeas Corpus, dated June 5, 2001.

4. "Tr." refers to the transcript of Petitioner's trial, conducted from November 6 to November 18, 1996. This transcript includes testimony during trial and the trial judge's jury charge.

On October 14, 1995, police officers noticed Petitioner, who matched descriptions given by Evans and the Atkinsons (Tr. at 324), on the street near the Evans' apartment (*id.* at 323–24). Petitioner was then stopped, frisked, and subsequently arrested for the possession of a crack pipe. (*Id.* at 327–32, 359.) Petitioner was brought to the local precinct for questioning and a line-up identification (*id.* at 358–60), and was ultimately indicted on November 3, 1995 on two counts each of robbery, burglary and sodomy. (Resp. Mem. at 5.)

## PROCEDURAL HISTORY

### A. The Mapp Hearing

Prior to trial, the trial court (Justice Herbert Altman) conducted a *Mapp* hearing, to decide motions made by Petitioner to suppress the crack pipe, identifying statements by the Atkinsons and Evans, and statements made by Petitioner to the police.[5] At the hearing, Officer Joseph Turski ("Turski") testified that, in October 1995, he was assigned to investigate a pattern of burglaries taking place on the Upper East Side. (Hearing Tr. at 66–67.)[6] After interviewing the Atkinsons and Evans, the 19th precinct formulated a profile of the burglar as a black man, from 30 to 40 years of age, weighing approximately 160 to 200 pounds, five feet eight inches to six feet tall, with short cropped hair and a neatly trimmed beard. (*Id.* at 67.) The man they searched for was also known to dress neatly, have the occasional odor of alcohol on his breath or cigarette smoke on his clothing, and carry a razor or knife. (*Id.* at 67–68.) In addition, during one of the burglaries, the burglar had pulled from

his pocket a watch with a white face. (*Id.* at 101.)

Turski testified that, on October 14, 1995, Turski and his partner, Officer Alfred Esposito ("Esposito"), were undercover and driving in an unmarked car near East 91st Street and Park Avenue. (Hearing Tr. at 69.) While in their "target area," the officers observed Petitioner, at the time only identified as a black man fitting their composite profile, and proceeded to follow him. (*Id.* at 70–71, 98–99.) Turski and Esposito soon exited the car and stopped Petitioner. (*Id.* at 73, 99.) As he approached Petitioner, Turski had his weapon drawn and pointed at Petitioner, due to police information that "midnight burglars" could be armed and dangerous, and that the person they were looking for was known to carry a weapon. (*Id.* at 73–74.) Turski and Esposito ordered Petitioner to stand against the front of the car, while Turski patted him down and Esposito questioned him about his reasons for being in the area. (*Id.* at 73–75; 99, 103–04, 119–122.)

According to Turski and Esposito, as Turski finished frisking Petitioner, the officers noticed that he was wearing a watch with a white face (Hearing Tr. at 101–02), and they also saw what appeared to be a cigarette pack containing a crack pipe in Petitioner's front shirt pocket (*id.* at 75, 104). Turski and Esposito subsequently arrested Petitioner for criminal possession of drug paraphernalia (the pipe) and a controlled substance (residue in the pipe), and brought Petitioner to the 19th precinct. (*Id.* at 106.) Esposito testified that, while processing the arrest, he took Peti-

---

5. A *Mapp* hearing is held pursuant to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), to determine whether evidence was obtained in violation of Petitioner's Fourth Amendment right to be free from unreasonable search and seizure.

6. "Hearing Tr." refers to the transcript of Petitioner's *Mapp* hearing, conducted on May 23, 1996.

tioner's fingerprints and palm prints, and then began questioning Petitioner. (*Id.* at 106–09.) Esposito further stated that, in response to a detective informing Petitioner that they were investigating a number of burglaries, Petitioner claimed, "I ain't climbing in nobody's windows. I'm not doing that creep thieving." (*Id.* at 109.)

According to the testimony of Detective Hope McCarthy ("McCarthy"), on the afternoon of October 14, 1995, Petitioner's photograph was taken at the 19th precinct and brought to Evans, who selected Petitioner out of a photo array as the man who had attacked her. (Hearing Tr. at 13–16.) Evans and the Atkinsons were then brought to the precinct to view a line-up, at which time each of them selected Petitioner as the man who had entered their homes. (*Id.* at 17–21, 24–26.)

In a written decision dated August 23, 1996, Justice Altman ruled on the arguments made by Petititoner at the *Mapp* hearing, determining that:

> "[a]lthough in the context of an anonymous tip 'general descriptions are not sufficient to constitute reasonable suspicion[,]' here the police possessed a description of significant detail which they had synthesized from the accounts of identified crime victims and which defendant fit with great particularity."

(Affirmation of John E. Knudsen in Opposition to Petitioner's application for writ of habeas ("Knudsen Aff."), sworn to July 24, 2001, Ex. B at 5 (citations omitted).) Distinguishing the circumstances of Petitioner's arrest from the use of a profile that merely established "a general description which could [ ] fit a large sector of the population," *People v. Dossantos,* 137 A.D.2d 763, 524 N.Y.S.2d 837 (2d Dep't 1988), the court noted the "more than sufficient congruence" between Petitioner's appearance and the profile created by the 19th precinct (Knudsen Aff. Ex. B at 6).

Further, the court determined that Petitioner's match to the detailed profile and his presence near the burglarized locations at the approximate day and time of the week that the burglaries had typically taken place "collectively engendered the reasonable suspicion that the man before [the officers] was the burglar they sought." (*Id.* at 6–7.) The court, therefore, held that "[t]he information possessed by officers Turski and Esposito entitled them to stop and frisk the individual who so closely fit the description of the person they were seeking." (*Id.* at 5.)

In addition, the court determined that:

> [officers Turski and Esposito] acted prudently in subjecting defendant to an immediate frisk, as they reasonably suspected that they were in danger of physical injury. The observation of the crack pipe by the officers was a direct result of this legally justified frisk. I find that the pipe fell within their plain view as they appropriately forced the defendant to assume an oblique stance for purposes of the frisk. The arrest for possession of drug paraphernalia which followed was based upon probable cause and was not the product of an illegal search or other improper conduct.

(*Id.* at 7, 524 N.Y.S.2d 837 (citation omitted).) Finally, the court found that the statements made by Petitioner during his pat frisk were not the product of custodial interrogation requiring *Miranda* warnings, that the photo arrays and line-ups conducted were not "conducive to misidentification," and that testimony concerning the lineup identifications and in-court identifications was not precluded by the prosecution's failure to give notice regarding use of the photo array. (*See id.* at 7–9.) The court, therefore, denied Petitioner's motion to suppress in its entirety.

## B. *Jury Selection*

Jury selection for trial was conducted in three rounds. (Voir Dire Tr. at 25–26, 84, 123–24.) [7] In the course of the first round, the defense raised a *Batson* objection (*id.* at 73), which was seemingly obviated by the prosecution's realization that, having been confused by the court's system for assigning numbers to prospective jurors, it had exercised peremptory strikes against jurors it had not desired to challenge (*id.* at 74–76). Although defense counsel stated that he would nonetheless "reserve" his *Batson* objection (*id.* at 83), that first-round objection is not presently before this Court.

In the second round of jury selection, the defense again raised a *Batson* objection, directed to the prosecution's peremptory challenges of two black jurors, Debra Smith ("Smith"), and Ethyl Sylvester ("Sylvester"). (Voir Dire Tr. at 118.) [8] In response to this objection, the prosecution initially noted that it had not challenged another prospective black juror seated in the same round. (*Id.*) With respect to the challenged jurors, the prosecution highlighted that Sylvester had "been retired since 1989 and that's about seven years. And seems to me, this is a case involving a lot of testimony of detailed nature. I feel that it's a kind of case where a person ha[s] to pay a lot of attention." (*Id.* at 119.) At that point, the court interjected, stating:

> I can understand, Ms. Sylvester was not a forthcoming juror at all in terms of her biographical statement. She said virtually nothing and was reluctant to

give much information in answer to other questions, so I can understand that. *Id.* at 119–20. The court then questioned the prosecution regarding the challenge to Smith, who was a long-standing manager at the state Department of Probation. (*Id.* at 120.) The prosecution noted that Smith's job would involve her "all day long with persons coming into the system, going on probation, being violated on probation," and that the prosecution was "concerned about having a juror on the case who would be that intimately involved in that kind of detail of the criminal justice system." (*Id.*)

The defense then stated its belief that the reasons articulated for the prosecution's challenges of both Smith and Sylvester were pretextual in nature. (Voir Dire Tr. at 120–21.) The court disagreed, and denied the *Batson* motion. (*Id.* at 121.) In the third and final round of jury selection, the defense made no further *Batson* motions. (*Id.* at 123–169.)

## C. *The Trial*

Petitioner was tried by a jury from November 6 to November 18, 1996. At trial, the prosecution presented several witnesses, including the Atkinsons, Evans, and a number of police officers who described the investigation of the events of September 16, 1995, and October 7, 1995, the physical evidence linking Petitioner to those events, and the circumstances surrounding Petitioner's arrest. (Tr. at 30–461.) The defense called Petitioner's wife and four other witnesses, who primarily attempted to establish an alibi for Petitioner. (*Id.* at 463–894.) Petitioner was con-

---

7. "Voir Dire Tr." refers to the transcript of the jury selection process, conducted on November 4, 1996.

8. Although defense counsel framed this as a "renewed" *Batson* objection, it appears clear

from the record that this second *Batson* objection was directed solely at peremptory challenges exercised by the prosecution in the second round of jury selection. (*Id.* at 118–21.)

victed of two counts each of robbery, burglary, and sodomy in the first degree (*id.* at 1023–24), and was sentenced to a total term of twenty-two to forty-four years (Pet. at 2).

### C. *Appellate Review*

Petitioner timely appealed to the Appellate Division, First Department, asserting that the trial court improperly denied his motion to suppress evidence, after Petitioner was allegedly stopped and detained in violation of his Fourth Amendment and state constitutional rights. (Knudsen Aff. Ex. C at 21–30.) Petitioner further claimed that the trial court erroneously denied his *Batson* application by improperly accepting the prosecution's stated reasons for its second round peremptory challenges, in violation of Petitioner's Sixth Amendment and state constitutional rights. (*Id.* at 30–42.) The Appellate Division disagreed with Petitioner, determining that the arresting officers had reasonable suspicion to stop and frisk Petitioner, that the record supported the trial court's conclusion that the prosecution's reasons for its juror challenges were "race-neutral and nonpretextual," and that Petitioner's motion to suppress and *Batson* application therefore had been properly denied. *People v. Baker*, 264 A.D.2d 692, 696 N.Y.S.2d 125 (1st Dep't 1999). The Court of Appeals denied leave to appeal on February 2, 2000, *People v. Baker*, 94 N.Y.2d 901,

707 N.Y.S.2d 385, 728 N.E.2d 984 (2000), and the instant petition followed.[9]

### *DISCUSSION*

### I. *PETITIONER'S FOURTH AMENDMENT CLAIM IS UNREVIEWABLE BY THIS COURT.*

In his first claim, Petitioner argues that the Appellate Division erred in affirming his conviction after his motion to suppress was denied because, according to Petitioner, his Fourth Amendment rights were violated when he was allegedly stopped without reasonable suspicion and arrested without probable cause. (*See* Pet. at 5; Pet. Mem. at 19.)[10] This claim, however, may not be reviewed by this Court.

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court established that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. 3037; *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir.1992). A federal court "ha[s] no authority to review the state record and grant the writ simply because [it] disagree[s] with the result reached by the state courts" on a Fourth Amendment issue. *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir.1977); *see also Torres v. Irvin*,

9. In this case, Petitioner raised both of his present claims on direct appeal and in his letter seeking leave to appeal the affirmance of his conviction. (*See* Pet. at 3.) By doing so, Petitioner fairly presented his claims to the highest state court, *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994) (citation omitted), thereby affording the state the " 'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275, 92 S.Ct. 509 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971)). Thus, to the extent

Petitioner's claims are now cognizable on habeas review, they are exhausted and ripe for review by this Court. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir.1997).

10. "Pet. Mem." refers to Petitioner's Brief in Support of § 2254 Petition, dated March 14, 2001.

33 F.Supp.2d 257, 264 (S.D.N.Y.1998) ("A petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a Fourth Amendment claim."). The only way a federal court can review such a claim is where "the state has provided no corrective procedures at all," or the state has provided a corrective mechanism, but the defendant is precluded from using that mechanism "because of an unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70 (citing *Gates*, 568 F.2d at 839); *Torres*, 33 F.Supp.2d at 264.

Petitioner claims that he was denied an opportunity for a "full and fair hearing" to present his Fourth Amendment claim in state court, and that the Appellate Division "failed to reach the facts and merits of the case and circumstances." (*See* Pet. Mem. at 18–24; *see also* Pet. Reply at 3.) [11] His arguments, however, are unavailing, as Petitioner was afforded an extensive pre-trial *Mapp* hearing. The state court need only grant a petitioner "an *opportunity* for full and fair litigation of a fourth amendment claim." *Capellan*, 975 F.2d at 71 (citation omitted). Moreover, Petitioner availed himself of the opportunity to attack the legality of the state court process by raising such issues to the Appellate Division, which determined that:

> The arresting officers possessed reasonable suspicion to stop and frisk defendant since his physical appearance sufficiently matched that of a description of a serial robber/burglar and defendant was spotted in the victimized neighborhood on a day of the week and at 6 A.M., the hour during which the prior crimes had occurred.

*Baker*, 264 A.D.2d 692, 696 N.Y.S.2d 125. After this analysis, the court held that "Defendant's motion to suppress physical evidence, statements and identification testimony was properly denied." *Id.* The Appellate Division, therefore, conducted "a reasoned method of inquiry into relevant questions of fact and law," reaching the merits of Petitioner's Fourth Amendment claim. *Capellan*, 975 F.2d at 71 (citation omitted). Petitioner cannot demonstrate that the state failed to provide a corrective procedure, or that an "unconscionable breakdown" has occurred in that corrective process, and thus it is evident that Petitioner was afforded a full and fair opportunity to litigate his claim in state court. This claim, therefore, is not reviewable by this Court and should be dismissed.

## II. *PETITIONER'S BATSON CLAIM SHOULD BE DISMISSED.*

Petitioner also claims that the Appellate Division erroneously affirmed his conviction, after the trial court improperly denied his *Batson* objection during the second round of jury selection. (*See* Pet. at 5; Pet. Mem. at 6–17.) Petitioner contends that "the court's [*Batson*] inquiry yielded no compelling reasons that black[ ] jurors should be excluded," (Pet. at 5), and that the prosecution's explanations for its peremptory challenges—namely, that one prospective juror might be unable to pay attention and another might be biased as a result of her employment with the state Department of Probation (Voir Dire Tr. at 119–20)—were pretextual (Pet. at 5; Pet. Mem. at 6–7).[12] Respondent counters that

---

**11.** "Pet. Reply" refers to Petitioner's Reply to Respondent's Memorandum in Opposition to § 2254 Petition, dated August 14, 2001.

**12.** Respondent does not argue that Petitioner failed to make out a *prima facie* case of discrimination (*see infra* at 14–15), but in any

event, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot," *Hernandez v. New York*, 500

the Appellate Division's decision denying Petitioner's *Batson* motion was entirely consistent with Supreme Court precedent, that the facts before the Appellate Division fully supported the decision rendered, and that Petitioner's claim before this Court therefore should be dismissed. (*See* Resp. Mem. at 22–23.)

### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets out the standards for a federal court's review of a habeas claim that was "adjudicated on the merits" in state .court proceedings. Because Petitioner's *Batson* claim was adjudicated on the merits by the Appellate Division, this Court must review that claim under AEDPA. *See Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001).[13]

The relevant portion of AEDPA, codified at 28 U.S.C. § 2254(d) (2000), provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a deci-

sion that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Questions of law, as well as mixed questions of law and fact, are reviewed under AEDPA Section 2254(d)(1). On the other hand, a state court's factual determinations are reviewed under Section 2254(d)(2), in conjunction with Section 2254(e)(1), which separately provides that a state court's factual findings must be presumed correct, and may be overcome only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). As explained by one commentator, "reading sections 2254(d)(2) and 2254(e)(1) of AEDPA *in pari materia* leads to the conclusion that section 2254(d)(2) divides 'determination[s] of the facts' into two categories—state court factfindings that are flawed because they are 'unreasonable,' hence are a basis for habeas corpus relief without more; and findings that are not flawed because they are '[ ]reasonable,' hence are presumed to be correct unless the petitioner proves otherwise 'by clear and convincing evidence.'" Liebman, James S. & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 20.2c, p. 751 (3d ed.1998).

### B. *Batson Requirements*

▓▓▓ In *Batson v. Kentucky,* 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69

---

U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

**13.** In *Sellan,* the Second Circuit held that the phrase "adjudicated on the merits" had "a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Id.,* 261 F.3d at 311 (2d Cir.2001). Here, the Appellate Division squarely resolved Petitioner's *Batson* claim on substantive grounds, holding:

Defendant's application pursuant to *Batson v. Kentucky* [ ] was properly denied. The record supports the court's conclusion that the reasons advanced by the prosecutor for exercising the peremptory challenges at issue were race-neutral and nonpretextual, and such findings are accorded great deference.
*Baker,* 264 A.D.2d 692, 696 N.Y.S.2d 125 (citing *People v. Wint,* 237 A.D.2d 195, 655 N.Y.S.2d 469 (1st Dep't 1997)).

(1986), the Supreme Court reaffirmed the proposition that a state's purposeful exclusion of jurors on the basis of their race violates the Equal Protection Clause. The Supreme Court established a three-part burden-shifting analysis for determining whether a prosecutor has impermissibly excluded jurors based on race. First, the defendant must "establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. 1712. To establish a *prima facie* case, the defendant must show that: (1) "he is a member of a cognizable racial group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," [14] and (3) "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* Once the defendant has established a *prima facie* case, "the burden shifts to the State to come forward with a neutral explanation" for challenging members of the protected group. *Id.* at 97, 106 S.Ct. 1712. Finally, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. 1712.

In *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Supreme Court noted that *Batson's* second and third steps must be distinguished. Initially, the prosecution must provide any "legitimate reason" for its strikes, proffering a reason that, on its face, "does not deny equal protection." *Id.* at 769, 115 S.Ct. 1769. This second stage does not require the prosecution to give an explanation that is persuasive or even plausible—provided that discriminatory intent is not inherent in the explanation. *Id.* at 768, 115 S.Ct. 1769; *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859. The inquiry then proceeds to step three, to determine whether the defense has carried its burden of proving purposeful discrimination. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769; *Galarza v. Keane,* 252 F.3d 630, 636 (2d Cir.2001). At this final step, the *Batson* analysis focuses on, *inter alia,* the persuasiveness of the prosecution's race-neutral explanation for the challenge, *see id.,* which "'largely will turn on [an] evaluation of credibility,'" *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (quoting *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712).

Based on the wording of the Petition, it is not entirely clear which step of the *Batson* analysis is being challenged in this habeas proceeding.[15] Construing the Petition liberally,[16] this Court will assume that Petitioner is challenging both the facial validity of the prosecution's stated "race-neutral" reasons for its peremptory

---

**14.** In *Powers v. Ohio,* 499 U.S. 400, 415–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court eliminated the requirement that the challenged jurors be of the same race as the defendant.

**15.** Petitioner has asserted, primarily, that "the trial court committed error when it accepted pretextual reasons to exclude African-American[s] from sitting on the [P]etitioner's jury" and that the Appellate Division erred in failing to reverse that decision (Pet. Mem. at 6–7), but has also claimed that the prosecution "fail[ed] to provide a sufficient race-neu-

tral reason that the court in 'good faith' could accept" (*id.* at 13).

**16.** *See Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir.1983) (where a petitioner is proceeding *pro se* and "lack[s] expertise," the Court "should review [his] habeas petition[ ] with a lenient eye"); *Matias v. Artuz,* No. 00–2203, 2001 WL 300543, at *2 (2d Cir. Mar.27, 2001), *cert. denied,* 534 U.S. 838, 122 S.Ct. 93, 151 L.Ed.2d 54 (2001); *Richter v. Artuz,* 77 F.Supp.2d 385, 392 (S.D.N.Y.1999).

strikes, and the trial court's ultimate credibility assessment of the prosecutor's explanations.

### C. *The Prosecution's Articulated "Race–Neutral" Reasons for Its Strikes*

█ In evaluating the race neutrality of the prosecution's explanations at the second step of a *Batson* analysis, "a [trial] court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. This initial determination is thus a question of law, and, under AEDPA, questions of law are reviewed under Section 2254(d)(1).

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court clarified the standards of review set out in that section of AEDPA. A state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent, *id.* at 405, 120 S.Ct. 1495, or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result, *id.* at 406, 120 S.Ct. 1495. An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to the particular facts before it. *Id.* at 413, 120 S.Ct. 1495. The Supreme Court has explained that "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495. Thus, the writ may not issue simply because the state court decision is erroneous or incorrect;

rather, the application must also be unreasonable. *Id.* at 411, 120 S.Ct. 1495.

Here, the Appellate Division identified the correct legal principle governing the propriety of the trial court's conduct; that principle derives from *Batson,* which the court cited. Thus, the first question before this Court is whether the Appellate Division's acceptance of the "race-neutrality" of the prosecution's explanations "unreasonably applied" the relevant *Batson* principle to the facts of this case. *See* 28 U.S.C. § 2254(d)(1).

Given (1) the lenient requirement that the prosecution provide *any* explanation, as long as it are "based on something other than" the juror's membership in the protected class, *United States v. Berger,* 224 F.3d 107, 120 (2d Cir.2000) (quoting *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859), and (2) the fact that the prosecution's explanations for its challenges indeed appear to have involved criteria other than race, this Court cannot say that, on this point, the Appellate Division "unreasonably" applied the relevant legal principle in upholding the trial court's determination. Therefore, under AEDPA, Petitioner's claim should be dismissed to the extent it is based on any challenge to the second step of the *Batson* analysis.

### D. *The Trial Court's Determination That the Prosecution's Reasons Were Not a Pretext for Discrimination*

Once race-neutral reasons have been provided, the trial court "must then determine whether the opposing party has carried its burden of proving 'purposeful discrimination,' such as by showing that the proffered explanation for the challenge is a pretext for discrimination." *United States v. Moore,* 4 F.Supp.2d 319, 321 (S.D.N.Y. 1998).

In this case, in response to the prosecution's explanations for its peremptory challenges, defense counsel attempted to argue that "the reasons proffered by the prosecution [were] pretextual in nature." (Tr. at 121.) Counsel's argument, however, was largely conclusory. Apart from contending that the prosecution's reasons were "pretextual," the only more specific argument advanced by counsel was that Ms. Smith (the prospective juror who was employed with the Probation Department) had "clearly said [during *voir dire* ] that nothing about [her] job would interfere with her deliberations or interfere with her judgment in the case" and that this potential juror had "unequivocally stated [that] she could be fair." (*Id.*) No other argument of any kind was made to support the *Batson* motion. (*See id.*) The trial court found that the prosecution's stated reasons were not pretextual, and the Appellate Division held that this finding was supported by the record and entitled to deference. *See Baker*, 264 A.D.2d 692, 696 N.Y.S.2d 125.

Unlike the second step of the *Batson* analysis, which involves a question of law, the third step of the analysis—the determination by the trial court as to whether the prosecution's facially neutral reasons are actually a pretext for a discriminatory motive—is fact-based, and turns on the credibility of the prosecutor. *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (citation omitted); *see also Moore*, 4 F.Supp.2d at 321–22 ("[n]o credibility findings are required at either of the first two stages of the three-step *Batson* analysis" but once "both sides carry their respective prima facie burdens, then the Court is permitted to become a fact-finder and rule on the ultimate question of violation of equal protection."). The Appellate Division was therefore correct that the trial court's finding on this issue was entitled to great deference. *See Baker*, 264 A.D.2d 692, 696

N.Y.S.2d 125; *see also United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir.1991); *Jordan v. Lefevre*, 22 F.Supp.2d 259, 272–73 (S.D.N.Y.1998), *aff'd in part, rev'd in part*, 206 F.3d 196 (2d Cir.2000). Indeed, under AEDPA, "[a] state court's determination whether a prosecutor's use of a peremptory challenge was motivated by discriminatory intent, in violation of *Batson*, is a factual determination and thus qualifies for [AEDPA § 2254(e)'s] presumption of correctness." *Bryant v. Speckard*, 131 F.3d 1076, 1077 (2d Cir. 1997).

In this case, the trial court's factual finding is fairly supported and cannot be deemed inherently "unreasonable," under AEDPA § 2254(d)(2). That finding must therefore be presumed correct, unless Petitioner has come forward with clear and convincing evidence to overcome that presumption. *See supra* at 14; 28 U.S.C. § 2254(e)(1).

In his submissions to this Court, Petitioner has challenged the state court's finding by pointing to the court's interjection of its own reasons for the prosecution's peremptory challenge of one juror. (Tr. at 119–20; Pet. Mem. at 9, 13, 15, 17.) Petitioner argues that, by doing this, the trial court removed the prosecution's burden to provide race-neutral explanations and, further, must not have accepted the prosecution's explanations. (Pet. Mem. at 9, 13, 15, 17.) The trial court's interjection, however, is immaterial, in that the court properly asked the prosecution to state the bases for both of its juror challenges, and the prosecution did so. Moreover, when defense counsel argued that the prosecution's race-neutral explanations were "pretextual," the court explicitly responded, "I find that they are not." (Tr. at 121.)

Petitioner also now suggests that the "pretextual" nature of the prosecution's jury strikes is evident from the fact that, while the prosecution supposedly challenged juror Sylvester because she was retired, the prosecution failed to challenge a white juror who was also retired. (Pet. Mem. at 8.) While this factor could be relevant, and could have weakened the credibility of the prosecution's explanations, *Alvarado*, 951 F.2d at 25, defense counsel never raised it before the trial court, and, in any event, the ultimate determination of discriminatory intent "depends on an aggregate assessment of all the circumstances." *Id.* at 26. Another factor that *was* raised, and that the trial court was entitled to consider in evaluating the prosecution's credibility, was that the prosecution decided not to challenge another black member of the proposed jury panel during the second round. *See id.;* Tr. at 118.

In addition, courts have frequently found factors such as age, ability to pay attention, and type of employment to be acceptable race-neutral criteria for peremptory challenges. *See, e.g., Moore v. Walker*, 234 F.3d 1262 (Table), No. 99 Civ. 2754, 2000 WL 1721120, at *2 (2d Cir. Nov.16, 2000) (permitting age, employment, demeanor, and inattentiveness as acceptable race-neutral bases); *United States v. Stavroulakis*, 952 F.2d 686, 696 (2d Cir.1992) (upholding peremptory challenge based upon employment history); *Alvarado*, 951 F.2d at 24–25 (allowing challenges based on age, life experience and employment); *Jordan*, 22 F.Supp.2d at 272–73 (citing cases utilizing age, life experience, employment and criminal history as acceptable factors).

In short, Petitioner has not come forward with clear and convincing evidence sufficient to alter the presumptive correctness of the state court's factual finding that the prosecution's grounds for its peremptory challenges were not pretextual. *See* 28 U.S.C. § 2254(e)(1); *see also Galarza*, 252 F.3d at 635 ("[A] trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, *inter alia*, to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record."). There is, therefore, no reason to disturb that factual finding, or the trial court's resulting conclusion that Petitioner had not demonstrated purposeful discrimination. Under AEDPA, there is thus no basis for this Court to set aside the Appellate Division's rejection of Petitioner's *Batson* claim, and, accordingly, I recommend that Petitioner's claim be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, I recommend that his petition for a writ of habeas corpus be DISMISSED in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, United States Courthouse, 500 Pearl Street, Room 201, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 40 Centre Street, Room 631, New York, New

York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Berman. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

January 18, 2002.